UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| *Plaintiff*, | ) ) ) |
| vs. | ) )   No. 1:15-cr-00214-JMS-DKL ) |
| DEON PARKER, | ) ) |
| *Defendant*. | ) |

**ORDER**

Presently pending before the Court is Defendant Deon Parker's Motion to Suppress. [Filing No. 27.] Mr. Parker has been charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). [Filing No. 10.] He seeks to suppress evidence recovered after what he contends was an illegal search and seizure in violation of his Fourth Amendment rights. As discussed below, Mr. Parker's motion is denied because the Court concludes there have been no constitutional violations. [Filing No. 27.]

**I.
FINDINGS OF FACT**[1]

On April 28, 2016, the Court held an evidentiary hearing on Mr. Parker's Motion to Suppress. [Filing No. 27.] The following are the Court's factual findings from the evidence presented at that hearing and submitted with the parties' briefs. In making the findings that follow, the Court has considered the testimony and the demeanor of the witnesses who testified at the evidentiary hearing: Indianapolis Metropolitan Police Department ("IMPD") Officer David McDaniel, IMPD Sergeant ("Sgt.") Scott Wildauer, IMPD Officer Brad Harvey, and Mr. Parker.

---

[1] To the extent that any findings of fact should be considered conclusions of law, they should be deemed to be such.

### A. Mr. Parker's Traffic Stop

Approximately at 10:00 a.m. on November 5, 2015, IMPD Officer Michael Antonelli contacted Officer McDaniel for his assistance in locating a person of interest and a tan extended cab pickup truck on the west side of Indianapolis. [Filing No. 28-1 at 1.] Officer McDaniel was not specifically advised as to the nature of the investigation, nor was he instructed that the lead investigators wanted to stop the pickup truck. Officer McDaniel was able to locate the pickup truck, which was parked around the 1800 or 1900 block of North Medford Avenue. Between 10:15 a.m. and 10:20 a.m., Mr. Parker drove the pickup truck southbound on Medford Avenue, and Officer McDaniel followed it. There was one car in front of Mr. Parker's pickup truck and another car between Mr. Parker's pickup truck and Officer McDaniel's vehicle. The cars were driving southbound on Medford Avenue as they approached a stop sign at West 16th Street. After the vehicle in front of Mr. Parker turned to West 16th Street, Mr. Parker drove up to the stop sign on West 16th Street, failed to come to a complete stop, and continued going southbound on Medford Avenue. Via his radio, Officer McDaniel informed the other officers that Mr. Parker had committed a traffic infraction for failing to come to a complete stop and was headed southbound on Medford Avenue.

That same morning around 10:00 a.m., an IMPD detective contacted Sgt. Wildauer for his assistance with surveillance of Mr. Parker and the tan pickup truck. The detective advised Sgt. Wildauer that they were hoping to stop the vehicle. After he was notified that Mr. Parker was driving southbound on Medford Avenue, Sgt. Wildauer drove to the parking lot of the Shell Gas Station located at the corner of Kessler Boulevard and West 16th Street, which is approximately one block west of Medford Avenue. He parked in the parking lot facing the intersection of West 16th Street and Medford Avenue. At the time that Mr. Parker approached West 16th Street, Sgt.

Wildauer observed Mr. Parker roll through the stop sign and continue driving southbound on Medford Avenue. Sgt. Wildauer heard Officer McDaniel's radio broadcast that the truck failed to stop, and he confirmed via radio that he had seen the infraction, too. Sgt. Wildauer followed Mr. Parker's vehicle and eventually stopped him near the intersection of West 12th Street and Medford Avenue.

### B. Dog Sniff of the Pickup Truck

Sgt. Wildauer walked to Mr. Parker's window and asked him for his driver's license and registration. Sgt. Wildauer informed Mr. Parker that he pulled him over because he ran through the stop sign on West 16th Street. As Mr. Parker was gathering his license and registration, Sgt. Wildauer noticed that Mr. Parker's hands were shaking, he was breathing heavily, and he seemed to be very nervous. He asked Mr. Parker why he was nervous and Mr. Parker answered that he was nervous because he was stopped by the police. After Mr. Parker handed Sgt. Wildauer his driver's license and registration, Sgt. Wildauer asked Mr. Parker to step out of the pickup truck. Mr. Parker exited the pickup truck and left the driver's side door open. Sgt. Wildauer asked Mr. Parker where he was going and he answered that he was on his way home, toward 34th and Riley. Sgt. Wildauer told Mr. Parker that he was going the wrong way (southbound away from 34th), but Mr. Parker claimed that he was taking a different route. Sgt. Wildauer patted Mr. Parker down and then asked him to stand by the curb in between the pickup truck and the police vehicle.

At that moment, Officer Harvey and his partner came to the scene as backup. From the time that Mr. Parker was stopped to the time that Officer Harvey arrived, the duration of Mr. Parker's stop was approximately one minute to one minute and a half. Sgt. Wildauer asked Officer Harvey to prepare a traffic citation so that Sgt. Wildauer and his police dog ("K-9") could conduct an open air sniff around the pickup truck. Sgt. Wildauer noticed again that Mr. Parker was nervous

and he asked him if he had been arrested before. Mr. Parker responded that he had and that it was for more things than he could remember. Sgt. Wildauer and his K-9 first conducted an open air sniff around the perimeter of the pickup truck. As they were going around the pickup truck again, the K-9 put its nose on the driver's side door, which was still open, and it went back and forth from the door to the seat, and eventually sat down on the ground. Based on their training together, Sgt. Wildauer understood the K-9's reaction to be an alert to the odor of narcotics. At that moment, Sgt. Wildauer asked Officer Harvey to stop drafting the citation and informed Mr. Parker that his K-9 gave an indication of the odor of narcotics. He asked for permission to search the pickup truck, but Mr. Parker denied the request. Sgt. Wildauer explained to Mr. Parker that he had probable cause to search his pickup truck, and then proceeded with the search. As a result, he found two firearms within the console area. Sgt. Wildauer placed Mr. Parker under arrest and read him his Miranda rights. No narcotics of any kind were located in the vehicle. After Mr. Parker waived his Miranda rights, subsequent questioning ensued, which led the officers to Mr. Parker's home and to the discovery of six additional firearms. [Filing No. 1 at 4-5.]

At the time the K-9 alerted, a few minutes after the stop, Officer Harvey had not yet completed the paperwork for Mr. Parker's citation.

### C. K-9 Certification and Training

Sgt. Wildauer and his K-9 were first certified together in October 2011. They have been certified annually and as recently as February 2015, though the February certification form was not signed by the certifying officer. The certification authorizes Sgt. Wildauer and the K-9 to work as a team for narcotics detection. During the training to receive the certification, the K-9 learned to detect different types of narcotics and Sgt. Wildauer learned the K-9's behavior when it detects

the odor of narcotics. According to Sgt. Wildauer, when the K-9 sits down after sniffing and searching a particular location, it means that the K-9 has detected the odor of narcotics.

### D. Mr. Parker's Version.

The foregoing paragraphs A through C constitute the Court's findings of fact; however, Mr. Parker testified as to a completely different set of facts. Resolution of the instant motion required a credibility determination by the Court, and as described below, the Court credits the Government's witnesses. Nevertheless, the Court will summarize Mr. Parker's version of events.

Mr. Parker testified that on the morning of November 5, 2015, his pickup truck was parked around 21st Street and Medford Avenue. He claims that he got inside his pickup truck and drove southbound on Medford Avenue heading home. He alleges that he was heading that direction because he intended to get on the interstate to drive home because it was quicker than driving through the city streets. He asserts that as he approached the intersection of Medford Avenue and West 16th Street, he came to a complete stop at the stop sign on West 16th Street before continuing to drive southbound on Medford Avenue. He claims that it is too dangerous to roll through the stop sign because there was a car parked on his left side, which he alleges obstructed his view of the westbound traffic on West 16th Street.

Mr. Parker claims that when he was stopped by Sgt. Wildauer, he was not nervous and his body did not display any signs of nervousness. He alleges that Sgt. Wildauer asked him for his driver's license and registration and told him that he was stopped for failure to stop at the stop sign on West 16th Street, but Mr. Parker disagreed that he failed to stop. He claims that without giving him a reason, Sgt. Wildauer asked Mr. Parker to exit the vehicle. He further alleges that Sgt. Wildauer inquired about the tint of the windows, asked several "irrelevant" questions, and asked him why he was nervous. Mr. Parker claims that he denied being nervous. He asserts that Sgt.

Wildauer asked him if he could search his vehicle, but he denied such request. He claims that despite his denial, Sgt. Wildauer retrieved his K-9 to walk it around the vehicle. Mr. Parker alleges that during that time, he was located behind his pickup truck and could move around freely and see both angles of the pickup truck. He claims that Sgt. Wildauer and the K-9 walked around the pickup truck twice and the K-9 walked as if the pickup truck did not exist. According to Mr. Parker, Sgt. Wildauer patted the inside of the wheel and caused the K-9 to jump on all fours. Mr. Parker also contends that the K-9 never sat down. He claims that Sgt. Wildauer told him that the K-9 "hit" the driver's side door and that he was going to search the pickup truck. He alleges that the search did not result in any drugs.

Mr. Parker claims that he owned the pickup truck for five months. He further alleges that he has never used drugs, has never had drugs inside the pickup truck, and has not been charged of any crime involving drugs.

## II.
### THE FOURTH AMENDMENT

On December 1, 2015, Mr. Parker was indicted with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Mr. Parker now moves to suppress evidence[2] that was recovered after what he contends was an unreasonable seizure and search of his vehicle in violation of the Fourth Amendment.

---

[2] In his brief, Mr. Parker does not expressly specify the evidence that he seeks to suppress. He indicates that the search of the pickup truck resulted in the discovery of two handguns, and that subsequent questioning led to a search of his home which revealed six additional firearms. [Filing No. 28 at 2.] The Court will presume, however, that Mr. Parker seeks to suppress the two handguns that were found in his pickup truck as well as any incriminating statements or evidence discovered after the search of his pickup truck.

6

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures. . . ." U.S. Const. Amend. IV. Generally, a warrantless search or seizure in the absence of probable cause is unreasonable. *United States v. Slone*, 636 F.3d 845, 848-49 (7th Cir. 2011). When police conduct an unreasonable search or seizure, the exclusionary rule usually vindicates the Fourth Amendment's protections by excluding the unlawfully obtained evidence. *Id.*

### III.
### DISCUSSION

Mr. Parker makes several broad arguments in his brief. However, at the hearing he clarified that he is challenging only the stop of his truck and the search of his truck. Based on the briefing and argument at the hearing, the Court will address three separate arguments related to the stop and search. First, Mr. Parker contends that he did not commit a traffic violation and that his traffic stop was pretextual. [Filing No. 28 at 3.] Second, he argues that even if the Court concludes that he committed a traffic violation, the traffic stop became unlawful when it was prolonged beyond the time reasonably required to complete the purpose of the stop. [Filing No. 28 at 3.] Lastly, Mr. Parker argues that there was no probable cause to search his truck. [Filing No. 28 at 3.]

**A. Traffic Stop**

Mr. Parker contends that Sgt. Wildauer's traffic stop was pretextual, and that the real reason Mr. Parker was pulled over was because Sgt. Wildauer believed he was in possession of guns that were stolen during a robbery. [Filing No. 28 at 3.] Mr. Parker denies the contention that he failed to come to a complete stop when he approached West 16th Street. [Filing No. 28 at 2.]

In response, the Government argues that Mr. Parker was pulled over because he committed a traffic violation. [Filing No. 30 at 1-2.] The Government claims that, from different locations, Sgt. Wildauer and Officer McDaniel each observed a tan extended cab pickup truck driving

7

southbound on Medford Avenue that failed to come to a complete stop at a stop sign on West 16th Street. [Filing No. 30 at 1.] The Government contends that Sgt. Wildauer initiated a traffic stop near the intersection of Medford Avenue and West 12th Street and identified Mr. Parker as the driver. [Filing No. 30 at 2.] According to the Government, failure to stop at a stop sign is a traffic offense in Indiana, and such violation gave Sgt. Wildauer probable cause to conduct a traffic stop of Mr. Parker's pickup truck. [Filing No. 30 at 2.]

Mr. Parker denies that he failed to stop at the stop sign.

If probable cause exists "to believe that a traffic violation has occurred," even a minor one, the Fourth Amendment authorizes a warrantless traffic stop. *Whren v. United States*, 517 U.S. 806, 810 (1996) (citations omitted). Probable cause requires "a reasonable belief that a law has been broken." *United States v. McDonald*, 453 F.3d 958, 961 (7th Cir. 2006). That inquiry is an objective one. *Whren*, 517 U.S. at 813; *Scott v. United States*, 436 U.S. 128, 138 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."). The probable-cause inquiry has two steps: First, determine what facts the officer knew at the time of the traffic stop, and, second, "decide whether a reasonable officer could conclude that these facts amount to a violation of the law." *United States v. Garcia–Garcia*, 633 F.3d 608, 613 (7th Cir. 2011).

First, with respect to the facts that the officers knew at the time of the traffic stop, Sgt. Wildauer and Officer McDaniel both saw Mr. Parker's pickup truck when he approached, but failed to stop at, the stop sign on West 16th Street. Sgt. Wildauer was parked in a parking lot approximately one block away from the intersection of West 16th Street and Medford Avenue.

Officer McDaniel was the third car behind Mr. Parker's pickup truck driving southbound on Medford Avenue at the time Mr. Parker approached West 16th Street.

Mr. Parker denies failing to stop and claims traffic was too heavy for him to have crossed West 16th Street without stopping. He further claims that his view of westbound traffic was blocked by a car parked to his left, such that he had to stop before crossing the travel lanes. The Court declines to credit his version for several reasons. Mr. Parker has significant self-interest in the outcome of the case. He is a convicted felon, and Federal Rules of Evidence 609 allows for consideration of that conviction on this issue of his credibility. During his testimony, he was asked where he was coming from as he traveled south on Medford. He answered vaguely and evasively, which undermined the truthfulness of his testimony. Finally, his testimony, unlike the officers', was uncorroborated. The Court therefore credits the officers' version.

In addition to the factual dispute he raises, Mr. Parker claims that his stop was pretextual. He claims he was targeted by the police and that the real reason he was stopped was because he was suspected of possessing guns that were stolen during a robbery. During the hearing, defense counsel sought to elicit testimony from Sgt. Wildauer and Officer McDaniel that they were given orders to locate Mr. Parker and his pickup truck and to follow him in hopes that he would commit a traffic violation so that he could be stopped. Sgt. Wildauer confirmed that was his understanding, but Officer McDaniel did not. Officer McDaniel credibly testified that he was unaware of the purpose or goal of the investigation and that he was called at the last minute to conduct surveillance only. The Court concludes Officer McDaniel's testimony undermines any claim of pretext.

However, given that Officer McDaniel did have a goal of stopping Mr. Parker, the Court will elaborate further. Even if the traffic stop were the result of law enforcement's hopes to stop Mr. Parker, no constitutional violation occurred because the Court finds that Mr. Parker did

commit a traffic violation and Sgt. Wildauer had a proper reason to initiate a traffic stop. *United States v. Murray*, 89 F.3d 459, 461 (7th Cir. 1996) ("Ulterior motives do not invalidate a police stop for a traffic violation, no matter how minor, if a motor vehicle law infraction is detected. That is the law, and the time for debating whether it is correct—historically or conceptually—has passed."); *United States v. Willis*, 61 F.3d 526, 530 (7th Cir. 1995) ("Because the stop was an objectively reasonable one . . . and one the trooper was empowered to make, we need not consider [the defendant's] subjectively-based submission that the basis for the stop was pretextual.").

With respect to step two of the *Garcia-Garcia* analysis, the officers were reasonable in concluding that Mr. Parker's failure to stop violated Ind. Code § 9-21-8-32, which states that "[a] person who drives a vehicle shall stop at an intersection where a stop sign is erected at one (1) or more entrances to a through highway that are not a part of the through highway and proceed cautiously, yielding to vehicles that are not required to stop."

Thus, the failure to stop at a stop sign provided the requisite probable cause to conduct a traffic stop. *See, e.g., United States v. Hernandez-Rivas*, 513 F.3d 753, 759 (7th Cir. 2008) ("We have held improper lane usage is a legitimate reason for an investigatory stop."). The Court denies Mr. Parker's Motion to Suppress with respect to the initial traffic stop.

### B.  Duration of the Traffic Stop

In his brief, Mr. Parker argues that the duration of his traffic stop "became unlawful when it was prolonged beyond the time reasonably required to complete the purpose of the stop." [Filing No. 28 at 3.] He challenges much of Sgt. Wildauer's testimony and denies that his hands were shaking, that he displayed any signs of nervousness, or that he was going the wrong direction when Sgt. Wildauer was asking him questions during the traffic stop. [Filing No. 28 at 1-2.] He claims that Sgt. Wildauer "rather quickly asked for additional officers to assist him" and that when they

arrived, "for no apparent reason, [Sgt. Wildauer] walked his 'narcotic-detection-trained [K-9] partner'" around the pickup truck until Sgt. Wildauer claims it gave a positive indication of controlled substances. [Filing No. 28 at 2.]

In response, the Government claims that when Sgt. Wildauer stopped Mr. Parker's pickup truck, "Officer Harvey arrived on scene and took over the process of issuing a citation" while Sgt. Wildauer ran his K-9 around the pickup truck. [Filing No. 30 at 3.] The Government argues that the K-9's sniff did not unlawfully extend the traffic stop. [Filing No. 30 at 4.] The evidence at the hearing established that at the time the K-9 alerted, no more than five minutes had elapsed.

Mr. Parker did not file a reply and did not argue about the length of the stop at the hearing.

In determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). "[T]he Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention." *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015). However, "a traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket." *Id*. at 1614-15 (internal quotation marks omitted).

There is no evidence that Sgt. Wildauer unreasonably prolonged Mr. Parker's traffic stop. After initiating the traffic stop, Sgt. Wildauer approached the driver's side door of the pickup truck and asked Mr. Parker for his driver's license and registration, and after noticing Mr. Parker's hands were shaking, asked him why he was nervous. Such line of questioning is permitted so long as it does not unreasonably extend the duration of his traffic stop. *See United States v. Childs*, 277 F.3d 947, 954-55 (7th Cir. 2002) (holding that an officer may question freely

11

as long as it does not expand the duration of the stop longer than necessary to investigate the original purpose of the stop). Because of Mr. Parker's nervousness, Sgt. Wildauer asked him to step out of the vehicle. At that time, Officer Harvey arrived at the scene and he was instructed to draft the traffic citation while Sgt. Wildauer ran the K-9 around the pickup truck. Sgt. Wildauer testified that the duration of time when he stopped Mr. Parker until the time that Officer Harvey arrived was approximately one minute to one minute and a half. Moreover, by the time that the K-9 detected the odor of narcotics, Officer Harvey was still not finished drafting the citation. The Court finds nothing improper about Sgt. Wildauer's protocol since the K-9 sniff did not unreasonably extend the duration of the traffic stop. *See Rodriguez*, 135 S.Ct. at 1615-16 ("An officer may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Thus, "[t]he critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff prolongs—i.e., adds time to—the stop.").

To the extent Mr. Parker challenges the duration of the stop, the Court finds no constitutional violation.

### C. Search of the Pickup Truck

Mr. Parker argues that "regardless of the legality of the traffic stop, there was no probable cause or exception to the warrant requirement justifying the vehicle search." [Filing No. 28 at 3.] He argues that there was no "odor of drugs or drugs in the car and further denies that the [K-9] displayed any behavior or signs indicating anything unusual about the front driver's door." [Filing No. 28 at 2.] Mr. Parker claims that he was able to move around the back of his truck at will, so that he could see the dog's behavior. He argues that he saw no behavior on the part of the dog to

indicate an alert. He also notes he has no record of drug use or drug crimes, and denies drugs were ever in the car.

The Government argues in response that since the traffic stop was lawful, the K-9's positive alert of drug detection during its sniff of the pickup truck gave Sgt. Wildauer probable cause to search the vehicle, which led to the recovery of two handguns in the center console. [Filing No. 30 at 3.] The Government contends that the fact that no drugs were found does not invalidate the search.

Faced with a challenge to a warrantless search, it is the Government's burden to prove that the search of Mr. Parker's pickup truck was reasonable. *Coolidge v. New Hampshire*, 403 U.S. 443, 445 (1971). The Government must show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement. *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009); *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). One of the exceptions is the automobile exception first recognized in *Carroll v. United States*, 267 U.S. 132 (1925). Under this exception, where there is probable cause to believe that a vehicle contains contraband or evidence of a crime, law enforcement may conduct a warrantless search of the vehicle. *Zahursky*, 580 F.3d at 521; *Carroll*, 267 U.S. at 153-56; *see also United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005).

"Probable cause" exists where based on a totality of the circumstances "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Zahursky*, 580 F.3d at 521; *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Scott*, 516 F.3d 587, 589 (7th Cir. 2008). It requires a probability, not absolute certainty, that contraband or evidence of a crime will be found. *Zahursky*, 580 F.3d at 521 (citations omitted). In determining whether there is probable cause to search, law enforcement officers may draw reasonable inferences from

the facts based on their training and experience. *Id.*; *see, e.g., United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006); *United States v. Farmer*, 543 F.3d 363, 377 (7th Cir. 2008).

After he stopped Mr. Parker and Officer Harvey arrived, Sgt. Wildauer took his K-9 around the pickup truck to conduct a narcotics-detection sniff of the vehicle, an action that does not infringe upon Mr. Parker's Fourth Amendment rights. *See Illinois v. Caballes*, 543 U.S. 405, 410 (2005) ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."). When the K-9 reached the driver's side door of the pickup truck, the K-9 put its nose on the driver's side door, went back and forth from the door to the driver's side seat, and eventually sat down. Sgt. Wildauer considered that behavior an alert, because when the K-9 sits down after conducting a sniff, it is signaling that it detects an odor of narcotics.

Again, the Court is confronted with a credibility determination. Mr. Parker is again self-interested, and a convicted felon, and his testimony was undermined by his demeanor. But, his testimony is corroborated by the fact that no drugs were located in the truck. The Court finds it somewhat unbelievable that Mr. Parker would have been free to roam along the back of the truck to observe the K-9's behavior. Sgt. Wildauer has years in training and certification with the K-9 and the Court found his demeanor to be credible.[3] Accordingly, the Court accepts the Government's version of the facts and finds that the K-9 did alert. Given the K-9's detection of the odor of narcotics, Sgt. Wildauer had probable cause to search the pickup truck, even though the search did not result in any drugs. *See Florida v. Harris*, 133 S.Ct. 1050, 1058 (2013) ("[I]f the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake

---

[3] Given the differences between the parties' testimony, a police dash-cam recording of this incident would have been helpful to the Court.

14

at all.  The dog may have detected substances that were too well hidden or . . . smelled the residual odor of drugs previously in the vehicle."  Thus, a dog with a satisfactory performance in a certification program provides a "sufficient reason to trust his alert" and "the dog's alert provides probable cause to search."); *U.S. v. Wyatt*, 133 Fed. Appx. 310 (7th Cir. 2005) (Police dog's positive alerts for drugs while walking around the recreational vehicle (RV) in which the defendant was stopped for speeding provided probable cause to search the RV, where the record established that the dog was well-trained, having completed a 14-week training course and a periodic refresher course).  Accordingly, Mr. Parker's challenge to the validity of Sgt. Wildauer's search of the pickup truck is without merit.

### IV.
### CONCLUSION

For the foregoing reasons, Mr. Parker's Motion to Suppress, [Filing No. 27], is **DENIED**.

Date: May 11, 2016

*(signature)*
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Michael J. Donahoe
INDIANA FEDERAL COMMUNITY DEFENDERS
mike.donahoe@fd.org

Jeffrey D. Preston
UNITED STATES ATTORNEY'S OFFICE
jeffrey.preston@usdoj.gov

Robert Martin Yoke
UNITED STATES ATTORNEY'S OFFICE
robert.yoke@usdoj.gov